# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ROBERT L. MURRAY,

                                        Plaintiff,

     v.

                                                                9:12-CV-401
DR. GILLANI,                                                    (LEK/ATB)
RC II NEPHEW,

                                        Defendants.

ROBERT L. MURRAY, Plaintiff, *pro se*
GREGORY J. RODRIGUEZ, AAG, for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

In this civil rights complaint, plaintiff alleges that defendants changed plaintiff's "mental health diagnosis" so that he would not be able to re-enter the Special Needs Unit ("SNU") in retaliation for filing lawsuits against the Office of Mental Health ("OMH"). (Compl. ¶ 6 & Causes of Action; Dkt. No. 1). Plaintiff seeks injunctive and monetary relief. (Compl. Prayer for Relief). On July 12, 2012, defendants filed a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 11). On November 28, 2012, after reviewing defendants' motion to dismiss and plaintiff's response to that motion, I issued an order converting the motion to dismiss to a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d) and 56. (Dkt. No. 15). In my November 28th order, I afforded both parties the opportunity to file additional materials in support of summary judgment. (*Id*.) Both plaintiff and defendants have filed additional materials in support of their respective positions. (Dkt. Nos. 22-23 (defendants), 26 (plaintiff)). The court will now proceed

to consider the pending motion for summary judgment, incorporating the additional materials submitted by both sides.

## DISCUSSION

I. <u>Facts</u>

    A. **Complaint**

In his complaint, plaintiff alleges that on December 17, 2011, defendants Dr. Gillani and RC II Nephew "changed" plaintiff's mental health diagnosis to justify their refusal to transfer plaintiff back into an SNU. (Compl. ¶ 6). Plaintiff claims that defendants' conduct was in retaliation for plaintiff filing lawsuits against OMH and other staff. Plaintiff claims that on December 17, 2011, he asked Dr. Gillani about going back to an SNU program, but that Dr. Gillani told plaintiff "you know what you did." (*Id.*) Plaintiff claims that he responded that "all I did was file a lawsuit against staff . . . ," and that Dr. Gillani stated "[t]hat's why I'm not sending you back." (*Id.*) Plaintiff claims that he filed lawsuits against the Department of Corrections and Community Supervision ("DOCCS") in 2006, 2008, and 2009, and that he was taken out of SNU "on false pretences [sic]." (*Id.*) Plaintiff states that he must go back into an SNU so that he can get the programs he needs to go home in February of 2013. (Compl. Third Cause of Action).

    B. **Defendants' Additional Evidence**

Defendants have each filed a Declaration in support of summary judgment in their favor. (Dkt. Nos. 23 (Sara Nephew), 23-1 (Dr. Sohail A. Gillani, M.D.)). In addition to the Declarations, defendants have filed plaintiff's related medical records.

Defense counsel has also filed the decision of the Central Office Review Committee ("CORC"), denying plaintiff's grievance, dated July 25, 2012. (Dkt. No. 22-3).

Defendant Gillani states that he is currently employed by OMH as a psychiatrist and has been employed at the Satellite Unit of the Central New York Psychiatric Center ("CNYPC") at Clinton Correctional Facility since August 2007. (Gillani Decl. ¶¶ 1-2). Defendant Nephew is currently employed as a Rehabilitation Counselor II ("RCII")[1] by OMH at the Satellite Unit of CNYPC at Clinton, and has been employed there since October of 2007. (Nephew Decl. ¶¶ 1-2).

Plaintiff's records reveal that he arrived at Clinton Correctional Facility on February 11, 2011, and at that time, plaintiff's mental health diagnoses were "Anti Social Personality Disorder ("ASPD") and Borderline Intellectual Functioning. (Nephew Decl. ¶ 4 & Ex. A; Gillani Decl. ¶ 4). Dr. Gillani states that he has been treating plaintiff since that time, and that plaintiff's diagnosis has not changed since he has been at Clinton. (Gillani Decl. ¶ 5). The last time that plaintiff's diagnosis changed was in December of 2009, more than one year before he was transferred to Clinton. (Nephew Decl. ¶ 4). On December 2, 2009, plaintiff's Axis I diagnoses of Schizoaffective Disorder and Mood Disorder NOI (Not Otherwise Specified) were deleted, leaving the ASPD and Borderline Intellectual Functioning diagnoses. (*Id.*) Plaintiff has never had the Schizoaffective Disorder or Mood Disorder diagnoses since then. (*Id.* & Ex. A).

---

[1] It is now clear that "RC II Nephwe" in the complaint refers to Rehabilitation Counselor Sara Nephew.

Dr. Gillani states that the SNUs, to which plaintiff refers in his complaint, provide programs and housing areas for inmates who have low intellectual functioning and adaptive behavior deficits, are not likely to take care of themselves, and are in general need of additional supervision, (Gillani Decl. ¶ 7; Nephew Decl. ¶ 5). Plaintiff was housed in the General Population at Clinton from the time he arrived on February 11, 2011 until December 17, 2011. (Gillani Decl. ¶ 10). Plaintiff did not report any conflicts with other inmates or staff, and during that time, did not receive any misbehavior reports. (*Id.*) Dr. Gillani states that plaintiff did not evidence any difficulty functioning in the prison environment, "secondary to his mental illness or due to his limited intellectual functioning." (*Id.*)

Dr. Gillani saw plaintiff on December 17, 2011, at which time, plaintiff requested that his primary therapist refer him to SNU, however, plaintiff's diagnosis and his ability to function properly in general population did not support a recommendation that plaintiff be referred to SNU. (Gillani Decl. ¶ 12). Plaintiff was taken out of SNU in August 2006, long before his diagnosis was changed in 2009, and long before he was transferred to Clinton and met either one of the defendants. (Gillani Decl. ¶ 13). Dr. Gillani continues to believe that plaintiff does not belong in the SNU, based upon all the evidence in plaintiff's file and based upon his ability for six years to remain out of SNU without any mental health problems. (*Id.* ¶ 14).

Defendant Nephew treated plaintiff for the first time on July 26, 2011. (Nephew Decl. ¶ 7). Defendant Nephew has attached her contemporaneous treatment notes as Exhibit B to her declaration. RCII Nephew states that she is a counselor at the

4

Satellite Unit at Clinton and sees patients once per month. When she began seeing plaintiff, he denied any conflicts with other inmates or with staff. (*Id.* & Ex. B, Dkt. No. 23 at CM/ECF p.9). A review of defendant Nephew's progress notes for July 26, 2011 shows that plaintiff was programming in general population and working in the mess hall. (*Id.*) Although plaintiff was cooperative, he requested placement in the Intermediate Care Program ("ICP").[2] (*Id.*) Plaintiff apparently believed (as he seems to believe currently), that he needed ICP "'to help me with programs to go home.'" (*Id.*) He told defendant Nephew that he wanted ICP so that he could access "ASAT and RSAT"[3] programming. (*Id.*) Defendant Nephew's notes state that she tried to explain to plaintiff "(several times)" that ICP was not appropriate for him because it was for individuals suffering from a serious mental illness, with a focus on treatment of that illness. (*Id.*) However, defendant Nephew states that plaintiff "appeared not to understand writer's explanation of his request for DOCS programming and how this is not what ICP is for." (*Id.*)

Defendant Nephew's next report is dated August 17, 2011. (*Id.* at CM/ECF p.11). She specifically noted that there were no changes in diagnosis, level, or medications since her last report. Plaintiff reported no stressors, was feeling well,

---

[2] Plaintiff appeared to use ICP and SNU interchangeably when he was speaking with defendant Nephew, although it does not appear that they are the same. On November 16, 2011, Ms. Nephew stated that plaintiff was "insistent" that he needed to be in "ICP or SNU to succeed in programming." (Dkt. No. 3 at 17). Any difference between the two is not relevant to the decision in this case.

[3] ASAT stands for "Alcohol and Substance Abuse Treatment." RSAT stands for "Residential Substance Abuse Treatment."

denied depression or anxiety, and reported improved adjustment to his mess hall job. However, he continued to insist that he belonged in ICP so that "he could go home." Defendant Nephew stated that although plaintiff previously carried psychotic diagnoses, his "current bizarre content is likely a product of his low intellectual functioning and his immature communication. He was functioning appropriately and was "ticket free." (*Id.*)

On September 11, 2011, plaintiff was still functioning appropriately in general population. (Nephew Decl. ¶ 9, Ex. B at Cm/ECF p.12). At that time, plaintiff was still fixated with allegedly having seen defendant Nephew on television.[4] Plaintiff was warned that if he continued to insist on calling defendant a "movie star," it would lead to a misbehavior report. Defendant Nephew stated that plaintiff was not in agreement with his diagnosis and insisted that he was Schizophrenic. He was concerned that he would not get the proper metal health treatment "on the street." (*Id.*) Although plaintiff still remained "ticket free," defendant Nephew's assessment states that plaintiff recognized that he "'ends up in the box'" when he did not take his medications, but could not make any further connections regarding the behavior that lead to SHU time. He was also "fixated on winning a lawsuit." (*Id.*)

Defendant Nephew's next report is dated October 13, 2011. (Nephew Decl. ¶ 10 Ex. B at CM/ECF p.15). Plaintiff began an ASAT program. He took the program before, but did not complete it successfully because he signs out when he does not want to be "bothered." He stated that he was not sure how long he would be able to

---

[4] This was not true, according to defendant. She had not been on television.

last in the program this time, before someone "'bothers him.'" (*Id.*) Plaintiff remained "ticket free" at the time.

Defendant Nephew also evaluated plaintiff on December 14, 2011. (Nephew Decl. ¶ 12 & Ex. B at CM/ECF p.9). Plaintiff reported that he was doing well and staying out of trouble. He was programming in Adult Basic Education ("ABE"), and there was no functional impairment at that time. However, he demanded ICP placement, but refused to discuss why he believed that he should be in ICP. He told defendant Nephew that he was not getting adequate mental health care, became verbally aggressive, and used profanity. (*Id.*) Plaintiff told defendant Nephew that she was "stressing [him] out." Defendant Nephew terminated the session, warning plaintiff that further aggressive behavior would result in a disciplinary ticket. (*Id.*)

In the declarations of both defendants, they state that, before a referral to SNU is made, that referral is discussed by the patient's "treatment team," and the Unit Chief of the Satellite Unit signs off on the referral before it is forwarded to the SNU facility.[5] (Nephew Decl. ¶ 6; Gillani Decl. ¶ 8).

## C. Plaintiff's Additional Evidence

In an attempt to support his retaliation claim, plaintiff has submitted evidence of a misbehavior report dated July 25, 2012, written against him by defendant Nephew.

---

[5] It is unclear from all the evidence herein, but from the phrase "forwarded to the SNU facility," it appears that in order for plaintiff to be in an SNU, he would have to be transferred to another facility that had an SNU in it. Even if this is true, it would not affect this court's opinion in this case.

(Dkt. No. 26 at CM/ECF p.5).[6]  Plaintiff argues that defendant Nephew lied in her declaration, because she did "not tell the court about this ticket." (Dkt. No. 26 at CM/ECF p.2).  Plaintiff then claims that this misbehavior report was written against plaintiff "for filing a law suit against her." (*Id.*)  Plaintiff attaches underlined portions of defendant Nephew's declaration which discuss plaintiff's lack of disciplinary tickets while incarcerated at Clinton up to December 17, 2011.[7] (*Id.* CM/ECF pp.3-4).  Plaintiff also attaches underlined portions of Dr. Gillani's declaration. (*Id.* at pp. 18-19).  Plaintiff submits a great many documents referencing events that occurred after plaintiff filed this action.

Plaintiff has also attached a report of his Parole Board appearance dated December 2012. (Dkt. No. 26 at CM/ECF pp. 13-14).  Plaintiff appeared before the Parole Board on November 27, 2012.  During his Parole Board appearance, plaintiff disagreed with the synopsis of his offense and claimed that he was initially arrested by the police from the 25th precinct "because he had sued the police department and won." (*Id.*)  The report discusses plaintiff's "institutional adjustment," finding that he has made various attempts to participate in substance abuse programs such as ASAT, but then began receiving misbehavior reports and failed to complete the programs.

---

[6] The court notes that this document is the basis of another case filed by this plaintiff against defendant Nephew on December 5, 2012, claiming that the misbehavior report was issued in retaliation for filing this law suit. *Murray v. Nephew*, 9:12-CV-1783 (FJS/CFH).  Plaintiff has also filed a new law suit against Dr. Gillani, *Murray v. Gillani*, 9:12-CV-1891 (LEK/DEP) and a lawsuit against Brian Fischer, *Murray v. Fischer*, 9:12-CV-1782 (FJS/TWD).

[7] The defendants use this date because it is the date on which plaintiff claims that the retaliatory conduct took place.

Plaintiff attaches this discussion in an effort to rebut the defendants' allegation that he maintained a good disciplinary record. (Dkt. No. 26 at 13).

Finally, plaintiff has filed a declaration that discusses events occurring in 2005 and 2006. (Dkt. No. 26-1 at 1-2). Plaintiff then writes about an alleged assault in 2006 when he was in the SNU program. (*Id.* at 1). He mentions the Western District of New York, and then alleges that on December 7, 2012 (while at Clinton), OMH and Corrections staff stole all the things in his cell, assaulted him, and attempted to kill him. (*Id.* at 2). Plaintiff claims that he was kept in a strip cell for seven days. Finally, plaintiff states that he was being paid for a program that he never attended. He claims that the people in the SNU program are angry because plaintiff let the court know what was going on in the program. (*Id.* at 3).

## II.   <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial

responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id*.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

10

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia*, to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a

11

prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance prior to filing the federal action.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[8] Based on these cases, the Second Circuit developed a

---

[8] *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004)

"three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford*, it has applied the three-part inquiry in recent cases. *See, e.g.*, *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007); *Davis v. State of New York*, 311 F. App'x 397, 399 (2d Cir. 2009); *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011).[9]

## B.    Application

When defendants in this action filed their motion to dismiss, they included the affidavit of Jeffrey Hale, Assistant Director of the Inmate Grievance Program, who

---

(whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[9] This court also notes that, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 548 U.S. at 104 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates*." *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

13

stated that although plaintiff filed a grievance requesting to be returned to the SNU, the CORC appeal was still pending at the time plaintiff filed this action. (Hale Decl.; Dkt. No. 11-2). I found that, notwithstanding plaintiff's assertion that he filed a grievance, Mr. Hale's declaration was not incorporated into the complaint by reference. (Dkt. No. 15 at 4) (citing *Vandever v. Murphy*, No. 3:09-CV-1752, 2012 WL 3727646, at *9 (D. Conn. March 13, 2012)). This was one of the reasons for the conversion to summary judgment.

Plaintiff argues that the CORC has twenty days to issue a decision, and thus, a decision on his grievance should have been issued by April 10, 2012. Plaintiff appears to argue that because the CORC did not decide his appeal in a timely manner, his administrative remedies would be deemed exhausted, and he should have been able to file his action.[10] However, the court notes that plaintiff filed this complaint on *March 5, 2012*, before he received the Superintendent's decision, and before he ever appealed his Superintendent's decision to the CORC. (Dkt. No. 1). The law is clear that exhaustion must take place prior to filing the federal action, and that subsequent exhaustion of remedies is insufficient to comply with the PLRA. *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001).

In addition to Mr. Hale's affidavit, the defendants have now filed the decision of the CORC, denying plaintiff's grievance appeal. (Dkt. No. 22-3 at 3). The CORC

---

[10] Pursuant to New York regulations, matters that are not decided within the time limits set by the regulations, may be appealed to the next step. 7 N.Y.C.R.R. § 701.6(g). This section refers to matters that are not decided at the IGRC level and the Superintendent's level. There is no mention of the CORC in this regulation.

decision is dated July 25, 2012, approximately four months after plaintiff filed this action. None of the exceptions to the exhaustion requirement apply in this case. Plaintiff simply filed this action before he completed his administrative appeals. There was no conduct by defendants that would have prevented him from waiting until his remedies were exhausted, and there are no other special circumstances that would have warranted the premature filing of this action. Thus, plaintiff failed to exhaust his administrative remedies prior to filing this action, and the court would be required pursuant to *Neal v. Goord* to recommend dismissal for failure to exhaust.

The court would also point out that the February 7, 2012 grievance filed by plaintiff states only that he is a mental health patient with special needs, and that he was originally in SNU, but was removed for *unknown* reasons. (Dkt. No. 13 at 10). Plaintiff also states that he was currently having mental health issues and wished to be returned to the SNU. (*Id.*) There is absolutely no mention of either one of the defendants in this action, of any claim that plaintiff's diagnosis was "changed," or that plaintiff was being subjected to retaliation for filing lawsuits.

The PLRA's exhaustion requirement is designed to afford corrections officials the opportunity to address complaints internally prior to an inmate filing a federal action. *Johnson v. Testman*, 380 F.3d at 697. A grievance must contain allegations that are sufficient to alert the defendants to the nature of the wrong for which redress is sought, not unlike the rules of "notice pleading" in federal court. *Id.* The *Johnson* court held that "[i]n order to exhaust, . . . , the inmates must provide enough information about the conduct of which they complain to allow prison officials to take

appropriate responsive measures." *Id.* While the PLRA does not require a legal theory of liability to be set forth in an inmate's grievance, nor does it require specific identification of the defendant, the alleged *misconduct* must still be described adequately. *See Espinal v. Goord*, 558 F.3d 119, 126-27 (2d Cir. 2009) (as long as the inmate provides enough information about the alleged misconduct, the State will normally be able to identify any direct party to a grievance on its own through investigation).

In this case, plaintiff never mentions either defendant in his grievance. Although this omission would not necessarily constitute a failure to exhaust, plaintiff never mentions that the reason for his failure to be "returned" to SNU was due to the retaliatory actions of any corrections personnel and never mentioned that this retaliatory conduct was based on his winning prior law suits. He has failed to describe the *conduct* that he is challenging in this action. Thus, plaintiff has not exhausted his administrative remedies with respect to the claims that he now brings in this action, first, because he did not complete the administrative process prior to filing this action, and second, even if he had waited for the appropriate administrative decisions, his grievance did not alert corrections officials to the conduct he is challenging in his federal complaint.

However, this court finds that exhaustion is only one basis for dismissal of plaintiff's complaint, and rather than recommending dismissal without prejudice for failure to exhaust, I will recommend that the complaint be dismissed in its entirety on the merits based on the following analysis.

16

## IV.  Retaliation

### A.  Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  *Bennett*, 343 F.3d at 137 (citation omitted).  Accordingly, plaintiff must set forth non-conclusory allegations.  *Id.*  Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct.  *Id.*

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)(quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 2003 U.S. App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in original).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

## B.    Application

Plaintiff claims that defendants Nephew and Gillani manipulated his mental health diagnoses on December 17, 2011 so that he would not be able to go back to the SNU in retaliation for his filing, and winning, lawsuits against unrelated defendants in the Western District of New York, based on conduct occurring at Attica and Wende Correctional Facilities.  Filing lawsuits is clearly constitutionally protected activity, but the evidence shows that plaintiff cannot establish any of the other requirements of a retaliation claim.

### 1.    Adverse Action

Defendants in this case have filed plaintiff's "Diagnosis Record," showing that the last change in plaintiff's diagnosis was made in 2009, *before* plaintiff was transferred to Clinton and *before* he ever met the two defendants in this action. Plaintiff was taken out of SNU in *2006* for disciplinary reasons.  Thus, neither defendant had any involvement in his removal from SNU, nor did they "manipulate" plaintiff's diagnoses at any time.[11]  Therefore, neither defendant took adverse action against plaintiff.  Without an adverse action, plaintiff's retaliation claim must fail.

### 2.    Defendants' Motivation

Neither Dr. Gillani, nor Ms. Nephew have ever worked at Attica or Wende Correctional Facilities. (Nephew Decl. ¶ 2; Gillani Decl. ¶ 2).  Each of the defendants

---

[11] Dr. Gillani did examine plaintiff on December 17, 2011, and has submitted his contemporaneous report as an exhibit to his Declaration. (Gillani Decl. Ex. A).  Although difficult to read, this exhibit does not indicate any change in diagnoses for plaintiff.  It merely notes that plaintiff wished to be transferred to SNU. (*Id.*)

affirm that they did not know about any specific law suits filed by plaintiff until this action. (Gillani Decl. ¶ 6; Nephew Decl. ¶ 9). Defendant Nephew states that during her examination of plaintiff on September 15, 2011, he appeared "fixated" on winning a lawsuit about being taken off psychiatric medication, but that defendant Nephew was unaware of the other details of that case. (Nephew Decl. ¶ 9).

The only previous action filed by plaintiff in the Northern District of New York involved excessive force[12] and an allegedly false misbehavior report. *Murray v. C.O. Foster*, 9:09-CV-872 (LEK/GHL). This action involved conduct that occurred at Great Meadow Correctional Facility in 2009 and was settled in February of 2011. (Dkt. No. 31 in 9:09-CV-872). A review of defendant Nephew's progress notes state that on July 26, 2011 "[p]atient is new to this writer's case." (Dkt. No. 23 at 9). In the same report, defendant Nephew states that the plaintiff was "not known to the writer."[13] (*Id.*) If defendant Nephew did not know plaintiff before July 26, 2011, she could not have been aware of his prior lawsuits and retaliated against him for those cases.

The court notes that in his response, plaintiff continues to complain about conduct that occurred in 2005 and conduct that allegedly occurred in the Western

---

[12] Plaintiff claimed that one defendant slammed plaintiff's finger in a cell door and then another defendant wrote a false misbehavior report against him. (*See* Dkt. No. 21 in 9:09-CV-872 (RR by Magistrate Judge Lowe at 2-3).

[13] Defendant made these comments in an unrelated situation. Plaintiff insisted during the first interview in July of 2011, that he had seen defendant Nephew on television. Ms. Nephew explained in her report that this was not possible, she did not know plaintiff before the interview, and that his statement insisting that he saw her, rather than an actress that looked like her, was "delusional." (Dkt. No. 23 at 9).

District of New York. At the same time, and in the same paragraph, he states that OMH staff and corrections staff took his property in December of *2012*. None of these facts relate to the claim that plaintiff is making in this case, and none of the documents submitted by plaintiff shows any relationship between plaintiff's failure to be placed in SNU, his lawsuits,[14] and these defendants. Thus, plaintiff cannot establish that the defendants were motivated by his prior law suits. *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord*, 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *8-9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals

---

[14] The lawsuits included in plaintiff's original response to defendants' motion to dismiss were all filed while plaintiff was either at Wende or Attica Correctional Facilities. These prior actions were claiming excessive force against corrections officers in the Western District of New York and were not related to plaintiff's mental status.

other than the defendants involved in the disciplinary action).

### 3. Non-Retaliatory Basis for Defendants' Conduct

Defendant Nephew's notes also state that, when plaintiff first asked about SNU at his first interview with her in July of 2011, she did not believe that plaintiff belonged in SNU. She states that she tried to explain that SNU or ICP was for inmates who were suffering from serious mental illnesses, and the mental health professionals did not believe that plaintiff's condition was appropriate for that placement. Although plaintiff initially stated that he understood the explanation, he continued to insist that he be placed in ICP. (Nephew Decl. Ex. B at CM/ECF p.9).

In support of their position that plaintiff's condition was not appropriate for the placement he requested, defendants state that plaintiff had remained free of disciplinary tickets. One of the reasons that plaintiff's referral to SNU was not warranted was because he was "functioning well in general population." (Nephew Decl. at ¶ 10 & Ex. B). Plaintiff challenges this assertion by filing his Time Allowance Committee Notice and his 2012 Parole Status Report, both indicating that plaintiff received multiple misbehavior reports while in general population. (Dkt. No. 26 at CM/ECF p. 13). However, defendants did not state that plaintiff had never been issued misbehavior reports. Defendant Nephew stated that plaintiff was free of disciplinary tickets *since he was transferred to Clinton in February of 2011.* A review of the document submitted by plaintiff shows that none of the misbehavior reports to

which the committee referred were issued between February of 2011[15] and December of 2011.

Defendant Gillani stated that plaintiff's last placement in SNU was in August of 2006, and since that time, he showed the ability to remain out of SNU, had no *medical* problems, had no problems functioning socially within the general population, participated in Adult Basic Education, was without any significant drop or change in self care and hygiene, and did not experience problems going to the mess hall or utilizing recreation for six years. (Gillani Decl. ¶ 13). The key to Dr. Gillani's statement was plaintiff's ability to function in general population, not his lack of misbehavior reports for six years.[16] It is his professional opinion that plaintiff does not belong in SNU.

The Parole Hearing Report does mention misbehavior reports, but only refers to the disciplinary tickets that plaintiff received prior to being transferred to Clinton. The last misbehavior report mentioned in the Parole Hearing Report was for threats and was dated December 17, 2010. It appears to be one of the reasons that plaintiff

---

[15] Consistent with defendants' statements, this report indicates that "Murray was again afforded the opportunity to be placed in I.C.P. [at Auburn on 8/23/2010, but] within a short time period (1/2/2011), he began receiving misbehavior reports." (Dkt. No. 26 at 13). The report further states that he was placed in ASAT on November 1, 2010, while still at Auburn, but refused to continue in the program and began receiving misbehavior reports. (*Id.*) "Due to Murray's program refusal and his 12/17/2010 Tier 3 report for threats, interference, harassment, and refusing a direct order, he was removed from I.C.P. and transferred to Clinton C.F. to complete his disciplinary sanctions." (*Id.*) However, once he arrived at Clinton, there were no misbehavior reports issued against him during the period relevant to this action.

[16] Plaintiff interpreted Dr. Gillani's statement as an assertion that plaintiff has been "good" in general population for six years since he was taken out of SNU.

was transferred to Clinton. The report discusses plaintiff's subsequent failure to complete programs, but does not indicate that plaintiff received misbehavior reports for failing to do so, and there is no indication that any of plaintiff's problems involved an inability to live in general population.

Plaintiff now alleges that defendant Nephew lied to the court because she did not mention the misbehavior report that she filed against him in July of 2012 "in retaliation" for this law suit. First, the court would point out that the basis of this action was that defendants Nephew and Gillani manipulated plaintiff's diagnoses to keep him out of SNU in retaliation for law suits filed in the Western District of New York, not in retaliation for this lawsuit. It is true that defendant Nephew filed a misbehavior report against plaintiff on July 26, 2012 for "threatening statements" about suing "her ass" and taking her to court.[17] (Dkt. No. 26 at 5).

However, defendant Nephew's July 26, 2012 misbehavior report notes that plaintiff had been counseled on prior call outs to refrain from threatening behavior. (*Id.*) A review of the medical records submitted by defendants shows that defendant Nephew had warned plaintiff several times about his aggressive behavior before she actually filed a misbehavior report against him. It is clear that plaintiff is attempting to create his own "retaliation" by acting so inappropriately that Ms. Nephew finally issued the misbehavior report about which plaintiff had been warned. On November 16, 2011, defendant Nephew's progress note states that plaintiff was being

---

[17] The court does note that the CORC decision, finally denying plaintiff's grievance was dated July 25, 2012. (Dkt. No. 22-3). Plaintiff could have been angry about this denial.

argumentative and demanding transfer to the SNU. (Dkt. No. 23 at 17). On December 14, 2011, defendant demanded ICP placement and talked "over" Ms. Nephew. (*Id.* at 19). He became verbally aggressive and used profanity toward defendant Nephew, who terminated the session and stated that "counsel [was] given to Mr. Murray to refrain from this aggressive behavior next session or it will result in a disciplinary ticket." (*Id.*)

In addition, a review of defendant Nephew's contemporaneous progress notes shows that, although plaintiff continued to insist that he needed to be in SNU in order to obtain proper programming, this was not true. In fact, defendant Nephew's notes state that plaintiff began an ASAT program on October 13, 2011. (Nephew Ex. B at 15). Ms. Nephew noted that plaintiff had attempted these substance abuse programs before, but admitted to her that he did not know how long he would last in the program until "someone bothered him." (*Id.*) It appears from these notes, and by plaintiff's own admission, that plaintiff's inability to complete the appropriate programming had to do with his behavior while in the program, not because of his "removal" from SNU. It is clear that defendants had a justifiable, and non-retaliatory reason for refusing to place plaintiff in SNU. Thus, plaintiff's retaliation claims may be dismissed.

## V.   Medical Care

### A.   Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id*. at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F. App'x at

236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter*, 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

## 2. Application

As discussed above, plaintiff's real problem in this case is that he disagrees with defendants over the treatment of his mental illness and does not appear to understand the purpose of SNU. Plaintiff believes that he belongs in SNU, and the defendants disagree with plaintiff's diagnoses and demands. Plaintiff has decided (incorrectly)

that he requires this placement in order to go home.  It is clear from defendant Nephew's progress notes that plaintiff is mistaken in this assumption, and that SNU is not appropriate housing for plaintiff.

A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id.* (citations omitted).  An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate.  *Id.  See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under § 1983).   Thus, to the extent that plaintiff's complaint may be interpreted as raising a claim that he is being denied adequate medical care, that claim may also be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No.

11) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 11, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge